CORRECTED

# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 23-1885V

| | |
|---|---|
| CAMILLE ASHCRAFT,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: February 27, 2025 |

*Jessi Carin Huff, Mctlaw, Mercer Island, WA,* for Petitioner.

*Emily Hanson, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION AWARDING DAMAGES[1]

On October 26, 2023, Camille Ashcraft filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered Guillain-Barré syndrome ("GBS"), causally related to an influenza ("flu") vaccine she received on October 5, 2022. Petition at 1 ¶¶ 1, 19, 21. After Respondent conceded entitlement, the parties were unable to resolve damages on their own,[3] so I ordered briefing on the matter.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Approximately two months after I determined Petitioner entitled to compensation, she informed me that the parties had reached an impasse in their damages discussions and requested that I set a briefing schedule. Status Report, filed Dec. 9, 2024, ECF No. 33.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$152,788.49**, **representing $150,000.00 for actual pain and suffering, plus** $2,788.49 for past unreimbursable expenses.

## I.  Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards – and properly emphasizes that in each case damages must be based upon the specific injured party's circumstances.

## II.    Prior SPU Compensation of GBS Pain and Suffering[4]

### A.    Data Regarding Compensation in SPU Flu/ GBS Cases

Flu/GBS cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, since SPU's inception ten years ago, 897 GBS cases have been resolved. Compensation has been awarded in the vast majority of cases (852), with the remaining 45 cases dismissed.

The data for all categories of theses damages decisions reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[5] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *56* | *412* | *20* | *364* |
| **Lowest** | $96,008.66 | $9,050.40 | $20,000.00 | $3,098.64 |
| **1st Quartile** | $156,760.64 | $125,000.00 | $128,700.00 | $100,000.00 |
| **Median** | **$171,082.15** | **$162,940.13** | **$224,397.27** | **$150,000.00** |

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of GBS claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

3

| 3rd Quartile | $186,457.51 | $244,193.98 | $380,028.33 | $221,250.00 |
| --- | --- | --- | --- | --- |
| **Largest** | $244,390.18 | $2,282,465.84 | $985,000.00 | $1,200,000.00 |

### B.   Adjudication Specifically of GBS Pain and Suffering

Only a small minority of cases have involved a special master's adjudication of damages issues. The written decisions setting forth such determinations provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[6]

As of January 1, 2025, in nearly every occasion that SPU has had to resolve the appropriate award for GBS pain and suffering, over $100,000.00 has been awarded (with a lower sum, lower sum, $92,500.00, only awarded once). The remaining fifty-five (55) awards far exceeded $100,000.00. The first-quartile value is $153,750.00. The median is $167,500.00. The third-quartile value is $178,500.00. The largest award was $197,500.00.

These decisions are informed by what is known about GBS, including its description as set forth in the Vaccine Injury Table ("Table"). Pursuant to the Table, vaccine causation is presumed for GBS with an onset 3 – 42 days (not less than 3 days, and not more than 42 days) after receipt of a seasonal flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(D). The Qualifications and Aids to Interpretation ("QAI") explain:

> GBS is an acute monophasic peripheral neuropathy that encompasses a spectrum of four clinicopathological subtypes… The interval between the first appearance of symptoms and the nadir of weakness is between 12 hours and 28 days. This is followed in all subtypes by a clinical plateau with stabilization at the nadir of symptoms, or subsequent improvement without significant relapse. Death may occur without a clinical plateau. Treatment-related fluctuations in all subtypes of GBS can occur within 9 weeks of GBS symptom onset, and recurrence of symptoms after this timeframe would not be consistent with GBS.

42 C.F.R. § 100.3(c)(15)(I) (2017). The three most common subtypes are acute inflammatory demyelinating polyneuropathy ("AIDP"); acute motor axonal neuropathy

---

[6] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

("AMAN"); and acute motor and sensory neuropathy ("AMSAN"). Id. The onset of each is marked by "bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs." Id. at (c)(15)(II). The fourth subtype – Fisher syndrome or Miller-Fisher syndrome – has a different onset of "bilateral ophthalmoparesis; bilateral reduced or absent tendon reflexes; [and] ataxia." *Id.* at (c)(15)(III).[7]

A consistent starting consideration is that "GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically alarming injury, such as SIRVA."[8] *Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. March 11, 2021); *see also, e.g.*, *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497, at *10 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (emphasizing recognition of "the seriousness of GBS as a general matter," in awarding a six-figure sum); *Voeller v. Sec'y of Health & Hum. Servs.*, No. 20-1526V, 2023 WL 5019830, at *10 (Fed. Cl. Spec. Mstr. July 6, 2023) (noting GBS's "frightening" nature).

But of course, not every GBS case is equally severe. Further details of the initial medical course are considered – including any mistake or delay in diagnosing GBS; any in-patient hospitalization and/or in-patient rehabilitation (and the duration of any such stays); diagnostic procedures (e.g., bloodwork, lumbar punctures, electrodiagnostic studies, imaging); the severity of symptoms at their nadir (e.g., involving incontinence or respiratory failure); the extent and effectiveness of treatment (e.g., IVIg, plasmapheresis, pain medications); other interventions (e.g., feeding tubes, breathing tubes, catheterization); and any complications (e.g., sepsis during hospitalization).

Also relevant is the long-term course – as evidenced by out-patient therapies, neurology evaluations, and other medical appointments concerning GBS; the results of repeat electrodiagnostic studies and other relevant tests; medical providers' assessments of the degree of recovery achieved; ongoing reliance on assistive devices and medications; and relevant treatment gaps. Previous opinions have recognized that "a substantial recovery does not mean that [an individual] has fully recovered from his GBS and has no ongoing sequelae. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." *Elenteny*

---

[7] *See also National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table – Notice of Proposed Rulemaking*, 80 Fed. Reg. 45132, at 45144 – 45 (July 29, 2015) (proposing addition of Table flu/GBS claims – explaining GBS is "an acute paralysis caused by dysfunction in the peripheral nervous system [that…] may manifest with weakness, abnormal sensations, and/or abnormality in the autonomic (involuntary) nervous system," and that death, when it occurs, is most often related to respiratory failure).

[8] Shoulder injury related to vaccine administration ("SIRVA") is another Table injury. 42 C.F.R. §§ 100.3(a), (c)(10).

*v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec. Mstr. Mar. 10, 2023). But symptoms of that nature are typically folded into a "typical" past pain and suffering award, and will not justify a future component. *See, e.g.*, *id.*; *Miller v. Sec'y of Health & Hum. Servs.*, No. 21-1559V, 2023 WL 2474322, at *8 (Fed. Cl. Spec. Mstr. Feb. 10, 2023).

"The mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life – especially one as alarming and potentially life-altering as GBS – and therefore is not alone reason for a lower award." *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021). However, a special master is statutorily required to consider to what extent a petitioner's pain and suffering is truly "*from* the vaccine-related injury," Section 15(a)(4) (emphasis added), and not from any unrelated preexisting or subsequently-developed medical issues. *See, e.g.*, *Bircheat*, 2021 WL 3026880, at *4; *Gross*, 2021 WL 2666685, at *5.

Also worthy of consideration are the injury's impact on a petitioner's personal circumstances including his or her family and other personal obligations, and professional life (whether or not lost wages are directly claimed).

All of these facts are primarily gleaned from the medical records – although sworn statements and/or other evidence may also be considered, especially if they *supplement*, and do not contradict, the facts reflected in the medical records.

### III. The Parties' Arguments

Petitioner asserts that she is entitled to a past pain and suffering award of $220,000.00. Petitioner's Brief in Support of Damages ("Pet. Brief"), filed Nov. 15, 2024, at 1, ECF 46. Contrasting her prior active and busy life as a mother caring for five children with her condition post-vaccination, she emphasizes the residual nerve pain she continues to experience – requiring prescription medication (Lyrica), weakness and numbness in her feet, fatigue, blurry vision, and an inability to sleep unless taking Gabapentin. *Id.* at 5-9. She especially laments her inability to care for her oldest daughter (age 17), who suffers from Angelman Syndrome[9] and requires around the clock care, or to earn extra money cleaning houses as she did prior to her illness. Pet. Brief at 9-10.

Emphasizing the view I have expressed in other decisions that pain and suffering

---

[9] Angelman Syndrome is "an autosomal recessive syndrome characterized by jerky puppetlike movements, frequent laughter, mental and motor retardation, peculiar open-mouthed facies, and seizures." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 1821 (32th ed. 2012).

6

awards in GBS cases should be greater than average (due to the nature of GBS as an alarming, unexpected vaccination adverse event)[10] and citing medical literature regarding the significant duration of many GBS illnesses,[11] she favorably compares the duration of her hospital stay, inpatient rehabilitation, continued medication, and overall duration of her GBS symptoms to those aspects of the *Fedewa, Johnson,* and *T.M.* cases[12] – all involving awards of $180,000.00. Pet. Brief at 15-19. Petitioner maintains that her compensation should be greater due to her Bell's Palsy diagnosis, continued need for prescription medication, and special needs of her daughter. *Id.* She specifically notes the *Johnson* petitioner's lack of inpatient rehabilitation and the *T.M.* petitioner's return to work within three months of symptom onset. *Id.* at 17, 19.

Respondent counters that $115,000.00 is an appropriate amount for Petitioner's past pain and suffering. Respondent's Brief on Damages ("Res. Brief"), filed Dec. 26, 2024, at 8, 11, ECF No. 34. Characterizing her GBS as mild to moderate, he maintains that Petitioner "had nearly fully recovered within eight months." *Id.* at 8. He underscores that Petitioner's Bell's Palsy "did not interfere with her ability to chew or swallow"; that within three months post-vaccination, her strength was normal, she no longer needed a walker to ambulate, and her facial tenderness was resolved; and that "[P]etitioner reported that she felt 'great overall' less than eight months after her GBS onset. *Id.* at 9 (quoting Ex. 8 at 166 – record from June 2, 2023 appointment). As comparable cases, Respondent cites *Castellanos* and *Granville*[13] – involving pain and suffering awards of $125,000.00 and $92,500.00, respectively. Res. Brief at 9-10.

Regarding the amount of unreimbursed expenses Petitioner seeks ($2,995.99), Respondent objects to only $207.50 for mileage to and from the Intermountain Primary Children's Hospital on the date when Petitioner received the flu vaccine (October 5, 2022). Res. Brief at 10-11. Because Petitioner did not complain of or seek treatment for

---

[10] Pet. Brief at 15 (citing *Gross v. Sec'y of Health & Hum. Servs.,* No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021)). As I stated in *Gross,* "it is my view that GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically-alarming injury, such as SIRVA." 2021 WL 2666685, at *5.

[11] These articles note that many individuals suffering from GBS will continue to have less obvious, albeit still debilitating symptoms, such as fatigue and sensory deprivation, seven or more years after their illness. Pet. Brief at 10-15.

[12] *Fedewa v. Sec'y of Health & Hum. Servs.*, No. 17-1808V, 2020 WL1915138 (Fed. Cl. Spec. Mstr. March 26, 2020); *Johnson v. Sec'y of Health & Hum. Servs.,* No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018); *T.M. v. Sec'y of Health & Hum. Servs.,* No. 19-0911V, 2023 WL 355358 (Fed. Cl. Spec. Mstr. Jan. 23, 2023).

[13] *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497 (Fed. Cl. Spec. Mstr. March 30, 2022); *Granville v. Sec'y of Health & Hum. Servs.,* No. 21-2098V, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023).

GBS symptoms until October 16, 2022, eleven days later, he insists Petitioner should not be compensated for this earlier trip. *Id.* at 11.

On reply, Petitioner focuses on the duration of her symptoms - insisting that medical record entries describing significant improvement establish the existence of ongoing sequela, since that very wording "proves that there are ongoing symptoms." Petitioner's Responsive Damages Brief, filed Feb. 19, 2025, at 2, ECF No. 37. She also criticizes Respondent's failure "to acknowledge [her] inability to provide care for her disabled daughter, as she previously did, due to her ongoing symptoms from her injury." *Id.*

In his responsive brief, Respondent argues that "the cases [P]etitioner cites in support of her claim for $220,000.00 in pain and suffering are distinguishable in many respects from [P]etitioner's case." Respondent's Responsive Brief on Damages ("Res. Reply"), filed Feb. 18, 2025, at 4, ECF No. 36. He insists that the greater amounts awarded in *Fedewa* and *T.M.* were based upon the additional difficulties those petitioners experienced during treatment – citing the improperly performed lumbar puncture and EMG in *Fedewa,* and the IVIG negative side effects in *T.M. Id.* at 2-3 (citing *Fedewa,* 2020 WL 1915138, at *2 and *T.M.*, 2023 WL 355358, at *17).

Regarding the duration of Petitioner's GBS, Respondent observes that "[n]one of [P]etitioner's providers have opined that her sequelae are permanent, and the medical records show that she was substantially recovered from her GBS within about eight months." Res. Reply at 3. He also criticizes Petitioner's conclusion that the unfiled medical literature she references shows "that '[m]ore likely than not, *all* GBS sufferers have permanent sequela, thus future pain and suffering.'" *Id.* at 3 (citing Pet. Brief at 15 (emphasis in the original)).

### IV.     Appropriate Compensation

#### A.     Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases

and rely upon my experience adjudicating these cases.[14] However, I ultimately base my determination on the circumstances of this case.

The evidence shows that Petitioner – age 45 when vaccinated - suffered a mild to moderate GBS illness, that included symptoms of Bell's Palsy. She obtained a quick diagnosis, was hospitalized for five days, and attended inpatient physical therapy ("PT") for an additional 14 days. Although Petitioner showed additional improvement following 37 outpatient PT sessions – completed less than six-month post-vaccination, she continued to experience residual, albeit mild, symptoms. She required prescription medication to address her nerve pain and help her sleep for at least 19-months post-vaccination.

Prior to vaccination, Petitioner suffered from hypothyroidism, anxiety, and depression. *E.g.,* Ex. 4 at 9. She underwent gastric bypass surgery in 2018, but continued to struggle with her weight. *E.g., id.* at 9-10. She received the flu vaccine on October 5, 2022. Ex. 1.

Eleven days post-vaccination, Petitioner visited the emergency room, complaining of weakness in her lower extremities that had progressed to her upper extremities, difficulty keeping her eyelids open, and general fatigue and weakness. Ex. 3 at 239. She was quickly diagnosed with GBS, admitted to the hospital, and obtained significant improvement from a five-day course of IVIG therapy, along with two additional treatments after she developed a droopy eye and left facial weakness. Ex. 10 at 499-501. Four days after transfer from the hospital to inpatient rehabilitation, it was noted that Petitioner still required a walker, but her strength continued to improve, and her pain was manageable if she took her medication as scheduled. *Id.* at 499. She was discharge to her home on November 2, 2022. *Id.* at 448-49.

By her first outpatient PT session, on November 8, 2022, Petitioner was ambulating well in her home, requiring a walker only when traveling longer distances. Ex. 3 at 176. She continued, however, to experience tingling in her hands and feet, a cold

---

[14] Statistical data for all GBS cases resolved in SPU by proffered amounts from inception through July 1, 2024 reveals the median amount awarded to be $165,000.00. The awards in these cases - totaling 376, have typically ranged from $126,711.56 to $250,000.00, representing cases between the first and third quartiles and awards comprised of all categories of compensation – including lost wages. 41 cases include the creation of an annuity to provide for future expenses.

The awards in SPU GBS cases involving substantive decisions - totaling 51, have typically ranged from $155,493.30 to $185,500.00, representing cases between the first and third quartiles, with a median amount of $170,558.64. The median amount of the past pain and suffering component was $165,000.00, with amounts falling within the first and third quartiles - $152,500.00 to $179,000.00.  Only two of these cases involved future pain and suffering awards.

sensation, and difficulties with visual tracking. *Id.* During a follow-up appointment with the neurologist, on January 12, 2023, Petitioner was assessed as fatiguing easily, experiencing "residual sensory disturbances in both legs," an "residual neuropathic pain which is currently manageable." *Id.* at 356. In the medical record from her last PT session on March 27, 2023, it was noted that Petitioner had a new job and was requesting a discharge from PT. *Id.* at 160. She was described as exhibiting increased strength and stamina, but still experiencing tingling in her hands and feet when stretching. *Id.*

At a follow-up appointment with her neurologist on October 27, 2023, approximately one year after symptom onset, it was noted that "[h]er residual symptoms dramatically resolved following her last dose of IVIG therapy." Ex. 9 at 5. Petitioner reported that her face was no longer tender, but she continued to have trouble sleeping, experienced "some residual leg weakness and numbness but no longer requires a walker," and that "[h]er feet are always cold and can be painful." *Id.* She was assessed as having an "[u]nstable balance on unlevel surfaces," "residual sensory disturbance in both legs," but improving activity tolerance. *Id.* at 7. Although the neurologist ordered additional PT for "gait and balance training," there is no record showing Petitioner pursued this treatment. *Id.*; *accord. Id.* at 8-9. The neurologist instructed her to continue her current medication. *Id.* at 7.

Petitioner has not returned to the neurologist, but did discuss her medication (Lyrica and Gabapentin) with her PCP on May 6, 2024. Ex. 12 at 5. Uncertain whether they were side effects of the medication or residual GBS symptoms, she reported blurry vision and fatigue. Expressing a desire to decrease her Gabapentin, she explained that she "[wa]s taking the Lyrica once a day with [G]abapentin at night. Noting "that if she does not take the [G]abapentin at night, then she will not sleep," Petitioner wondered if she could substitute Tylenol PM. *Id.* The PCP agreed, and instructed her to attempt that change.

Petitioner's ongoing residual symptoms and inability to care for her daughter and earn extra money, as she had done prior to her GBS, no doubt added to her suffering. Nevertheless, the amount she requests is clearly too high. Given the rapidly-obtained diagnosis, effective treatment without complication, and mild nature of Petitioner's long-term sequelae, this case does not warrant an award so far above the median amount awarded in other SPU GBS cases (as reflected in reasoned damages decisions).

In fact, Petitioner's pain and suffering award should be less than the $180,000.00 awarded in the cases she cited. Both the *Fedewa* and *T.M.* petitioners experienced difficulties during hospitalization – including side effects and a lack of response to IVIG treatment. *Fedewa*, 2020 WL1915138, at *2-4 (noting agitation related to IVIG treatment); *T.M.*, 2023 WL 355358, at *4-5 (noting a return to the symptom severity she initially

10

experienced several days after IVIG treatment). And the *Johnson* petitioner continued to struggle with significant ongoing sequelae, several years post-vaccination. *Johnson*, 2018 WL 5024012, at *4-5.

However, the *Granville* case cited by Respondent is similarly unhelpful. That petitioner did not require inpatient rehabilitation, had only two courses of PT, and attended only one neurology appointment after her hospitalization and only two months post-vaccination. *Granville,* 2023 WL 6441388, at *4. Although her primary care provider ("PCP") showed a willingness to prescribed Lyrica or Gabapentin for tingling in her hands and feet approximately seven months post-vaccination, there is no evidence that the *Granville* petitioner ever filled the prescription, and she acknowledged in her briefing that her GBS had completely resolved. *Id.* at *3.

The other case cited by Respondent, *Castellanos*, offers a better comparison as it reflects multiple similarities - related to symptom severity and duration and required treatment. The *Castellanos* petitioner showed substantial improvement following IVIG treatment during a nine-day hospital stay and 30 days of inpatient rehabilitation thereafter. *Castellanos,* 2022 WL 1482497, at *9. Like Petitioner, he required a walker during inpatient rehabilitation, but was able to walk without assistance after his discharge. *Id.* Although the *Castellanos* petitioner continued to experience cramps, numbness, and tingling, many of his ongoing symptoms were likely related to unrelated co-morbidities: diabetic peripheral angiopathy and carpal tunnel syndrome. *Castellanos,* 2022 WL 1482497, at *9-10. Thus, Petitioner's pain and suffering award should be greater.

I also find *Miller,*[15] in which $155,000.00 was awarded for pain and suffering, to be a useful comparable case. That petitioner suffered a mild to moderate GBS illness with accompanying Bell's Palsy symptoms and difficulty sleeping – as here. *Miller v. Sec'y of Health & Hum. Servs.,* No. 21-1559V, 2023 WL 2474322, at *2-4 (Fed. Cl. Spec. Mstr. Feb. 10, 2023). Although the *Miller* petitioner required Gabapentin for a much shorter time, he suffered exacerbating initial events - a fall in the bathroom before seeking treatment and complications related to the PICC line introduced to help facility his plasmapheresis[16] treatment. *Miller,* 2023 WL 2474322, at *3. Thus, Petitioner's award should be slightly less.

---

[15] *Dylla v. Sec'y of Health & Hum. Servs.*, No. 21-2310V, 2024 WL 1435504 (Fed. Cl. Spec. Mstr. Feb. 27, 2024); *Enstrom v. Sec'y of Health & Hum. Servs.*, 2023 WL 345657; *Merchant v. Sec'y of Health & Hum. Servs.,* No. 20-0450V, 2022 WL 17819548 (Fed. Cl. Spec. Mstr. Nov. 7, 2022).

[16] Plasmapheresis is the removal of plasma from withdrawn blood, with retransfusion of the formed elements into the donor, . . . done for the purposes of collecting plasma components or for therapeutic purposes. DORLAND'S at 1456.

Petitioner correctly notes that many individuals suffering from GBS will experience residual symptoms, such as fatigue, weakness, pain, and tingling in their extremities for years, even if they do not require additional treatment. However, she fails to appreciate that this factor is accounted for in *all* GBS pain and suffering awards. (Indeed, only the *absence* of some such sequelae would impact the award, but negatively).

### B.  Unreimbursed Expenses

Regarding the amount of out-of-pocket expenses, I agree that the $207.50 for the mileage traveled to the facility where she received the flu vaccine should not be reimbursed. This payment does not meet the requirements of Section 15(a)(1)(A)(iii), because it was not needed to diagnosis or treat Petitioner's symptoms. All other requested expenses will be awarded.

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $150,000.00 represents a fair and appropriate amount of compensation for Petitioner's past/actual pain and suffering.[17]**

**I therefore award Petitioner a lump sum payment of $152,788.49 representing compensation in the amounts of $150,000.00 for pain and suffering and $2,788.49 for actual unreimbursable expenses, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[18]

**IT IS SO ORDERED.**

                                                **s/Brian H. Corcoran**
                                                Brian H. Corcoran
                                                Chief Special Master

---

[17] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[18] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.